AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
1/8/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___TV___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
January 8, 2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ch___ DEPUTY

United States of America,

v.

DAVID ARNOLD SUMLIN JR.,

Defendant(s)

Case No. 2:24-mj-00095

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 2, 2024 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Robert Castruita
Complainant's signature

Robert Castruita  FBI Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: January 8, 2024

[Judge's signature]
*Judge's signature*

City and state: Los Angeles, California

Hon. Brianna F. Mircheff, U.S. Magistrate Judge
*Printed name and title*

AUSA: Daniel H. Weiner (x0813)

**AFFIDAVIT**

I, Robert Castruita, being duly sworn, declare and state as follows:

## I.     **PURPOSE OF AFFIDAVIT**

1.     This affidavit is made in support of a criminal complaint and arrest warrant against David Arnold SUMLIN Jr. ("SUMLIN") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition on or about January 2, 2024.

2.     This affidavit is also made in support of an application for a warrant to search the person of SUMLIN, as described more fully in Attachment A.

3.     The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition) (the "Subject Offense"), that were committed by and are being committed by SUMLIN, as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am a Police Officer of the Los Angeles Police Department ("LAPD") and a Task Force Officer ("TFO") of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been employed as a Police Officer for approximately 18 years.  I am currently a member of Harbor Area Narcotics Enforcement Detail and a TFO of the FBI's Violent Crime Major Offenders squad in Long Beach, California.

6.  Since joining the LAPD in 2005, I have received training in the investigation of violations of criminal law, such as drug-trafficking, firearm related offenses, including numerous hours of formal training at the LAPD Academy in Los Angeles, California.  During the time that I have been employed by the LAPD, I have participated in investigations relating to organized crime, narcotics, and firearm offenses.  I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting electronic and physical surveillance, working with informants, and the execution of search and arrest warrants.  Additionally, I have interviewed and/or debriefed informants and other witnesses who had personal knowledge regarding the subject matters of the investigations in which I have been involved, including narcotics trafficking and firearms offenses.

## III. SUMMARY OF PROBABLE CAUSE

7.  On January 2, 2024, SUMLIN, a convicted felon, shot his ex-girlfriend's puppy during an argument in Los Angeles, California.  Specifically, SUMLIN placed a pillow over the puppy, smashed a gun into pillow, and shot the puppy twice.  Shortly after being shot,

the puppy was transported to an animal hospital and died.  Law enforcement recovered two 9 mm caliber shell casings from the crime scene.

8.   After shooting the puppy, SUMLIN fled on foot and remains at large.  As discussed below, SUMLIN has a criminal history that includes multiple felony convictions and is therefore prohibited from possession firearms and ammunition.  Accordingly, I seek this complaint and arrest warrant for SUMLIN for being a felon in possession of ammunition and a warrant to search his person for evidence of the Subject Offense.

### IV. STATEMENT OF PROBABLE CAUSE

**A.   SUMLIN Shoots a Puppy**

9.   Based on my review of LAPD reports and my conversations with other LAPD officers, I know the following information:

   a.   On January 2, 2024, LAPD officers responded to a dispatch that there were "shots heard" at an apartment complex in downtown Los Angeles, California in the Central District of California.  The dispatch was based on victim S.W.'s 911 call reporting that her ex-boyfriend, later identified as SUMLIN, shot her puppy in her apartment.

   b.   Shortly thereafter, LAPD officers arrived at S.W.'s apartment unit inside the downtown Los Angeles apartment complex.  When they entered the unit, officers saw blood on the floor and a puppy suffering from what appeared to be gunshot wounds.

   c.   Officers also saw and recovered two spent 9 mm caliber shell casings and a spent bullet from the area near the puppy.

   d.   Officers transported the puppy to an animal hospital, where the puppy later died.

    e. During officers' interview with S.W., S.W. stated that the shooting started with a verbal argument between S.W. and SUMLIN.  Specifically, S.W. stated that SUMLIN, armed with a gun, said: "It [is] between you and the dog, and I chose the dog."  S.W. then said that SUMLIN grabbed a pillow, placed the pillow over S.W.'s puppy, smashed the gun into the pillow, and then shot the puppy twice.  S.W. stated that SUMLIN then fled the apartment.  S.W. followed SUMLIN and saw him walking southbound on Broadway Ave.

  10. Based on my conversations with other LAPD officers and my review of an LAPD news release, I know that SUMLIN -- potentially still armed with the firearm he allegedly used to shoot the puppy -- remains at large.

  **B.** **SUMLIN is a Convicted Felon**

  11. Based on my review of SUMLIN's criminal history records, I know that he has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

    a. On or about March 24, 2016, transportation of a controlled substance for sale in violation of California Penal Code Section 11379(a), Case No. BA44417001 in the Superior Court for the County of Los Angeles, State of California;

    b. On or about March 24, 2016, possession of a controlled substance for sale in violation of California Penal Code Section 11378, Case No. BA44417001 in the Superior Court for the County of Los Angeles, State of California;

    c. On or about May 25, 2017, attempted robbery in violation of California Penal Code Sections 664 and 211, Case No. TA13981301 in the Superior Court for the County of Los Angeles, State of California; and

      d.    On or about May 25, 2017, assault with a firearm, in violation of California Penal Code Section 245(a)(2), Case No. TA13981301 in the Superior Court for the County of Los Angeles, State of California.

    **C.**    **Interstate Nexus**

    12.    On January 8, 2023, FBI Special Agent James Yun examined photographs of the two spent 9 mm shell casings recovered from S.W.'s apartment. Special Agent Yun concluded that the spent shell casings were manufactured by Remington Peters either in the state of Wisconsin, North Carolina, Georgia, or New York.

### V. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

    13.    From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

      a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

      b.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing

or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

        c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

        d. Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VI. TRAINING AND EXPEREINCE ON DIGITAL DEVICES

14. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally,

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames

and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

16. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

17. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SUMLIN's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of SUMLIN's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

  18. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

19. For all of the reasons described above, there is probable cause to believe that SUMLIN violated 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition on or about January 2, 2024. There is also probable cause to believe that the items to be seized described in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offense will be found on the person of SUMLIN as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 8th day of
January, 2024.

_____
HONORABLE BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE